# MADDUX *v.* BOTTINEAU.

EQUITY; CONTRACTS; ATTORNEY AND CLIENT.

Bottineau, an attorney closely connected by kinship and otherwise with members of a tribe of Indians, with which a government commissioner had negotiated a treaty whereby the Indians were to cede their land to the government for $1,000,000, which sum was deemed inadequate by the Indians, entered into a contract with the tribe, which was not approved by the Interior Department, to prosecute its claim for the value of the land, irrespective of the treaty, and to receive for his services 7 per cent of any sum recovered. After prosecuting the claim for some time, contending. that the Indians were entitled to more than a million dollars, he assigned his contract to O'Grady, another attorney and former member of Congress, who agreed to repay him out of the fee received his advances for expenses to the amount of $23,000, if the claim should be allowed in an amount in excess of $1,000,000, and $12,500 if it should be allowed in that amount or less, and also one fourth of the balance of the fee. O'Grady, failing in his efforts to have Bottineau's contract with the Indians approved by the Department, and with its consent entered into negotiations for a new contract for a fee, in which he was aided by Bottineau and also by Maddux, and as a result the Indians made a contract with O'Grady and Maddux to pay them a fee of 5 per cent of any sum recovered up to a million dollars, and 10 per cent of any amount recovered in excess of that sum. The Department, urged by Bottineau, approved the contract. In the subsequent prosecution of the claim, Bottineau claimed he assisted, while O'Grady denied that he did so, and Maddux claimed that he had no knowledge of Bottineau's former connection with the case. O'Grady and Maddux made no effort to recover for the Indians more than a million dollars, and Congress appropriated that sum, providing in the appropriation act for payment of a fee of $42,000 to O'Grady and Maddux, who thereupon repudiated Bottineau. In a suit in equity by Bottineau to establish his right to a share of the fee, it was *held*, upon a review of the evidence, that he was entitled to $12,500, to be first deducted from the $42,000, and to one fourth of the balance, or a total of $19,875.

No. 2018.   Submitted November 5, 1909.   Decided November 30, 1909.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the. District of Columbia establishing the right of complainant to an interest in counsel fees provided for in an appropriation by Congress to pay Indians for certain lands taken by the United States; directing the receivers in the case to satisfy such interest out of the funds in their hands, and, in event of deficiency, awarding a personal decree therefor against the defendants.        *Modified and affirmed.*

The facts are stated in the opinion.

*Mr. W. H. Robeson* and *Mr. Samuel A. Putnam* for the appellants.

*Mrs. Belva A. Lockwood,* *Mr. John C. Fay,* and *Mr. C. E. Richardson* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

This is an appeal from a decree and judgment of the supreme court of the District entitling appellee, John B. Bottineau, to the sum of $18,875, with interest from March 10th, 1905, on account of services and expenses incurred in behalf of the Turtle Mountain Band of Chippewa Indians, as evidenced by an agreement in writing between appellee and appellant J. M. E. O'Grady.

This band of Indians formerly occupied a tract of several million acres of land in what is now the State of North Dakota. The land was opened to settlement without a recognition of the rights of the Indians. Appellee, a member of the bar of the state of Minnesota, claims to be a member of the tribe, and, at all events, has many relatives and friends among them. For many years prior to the incidents culminating in this litigation, he had devoted his entire time and expended quite a large sum of money in endeavoring to secure from Congress recognition of the rights of these Indians, and adequate compensation for their lands. The autonomy of the tribe was not recog-

nized by the government until 1882, at which time a reservation was assigned them. Appellee's efforts continued, so far as the record discloses, without assistance from 1878 to 1901, when appellant O'Grady first appeared upon the scene. In 1892 the so-called McCumber Commission negotiated a treaty with these Indians, whereby they were to cede 1,000,000 acres of land to the government for the consideration of ·$1,000,000. This compensation was deemed inadequate by many members of the band, and the authority of those members who negotiated the treaty was seriously disputed. Thereupon an agreement supplemented by a second agreement in 1896, was entered into between the tribe and appellee, by the terms of which appellee was to act as the tribe's attorney in the prosecution of its claim against the government for the value of the land claimed to have been appropriated, without regard to said McCumber treaty.

Bottineau removed from Minnesota to Washington, and from 1892 to 1901 devoted his entire time in an endeavor to obtain additional compensation for the lands of the tribe, which he had all along contended had been taken by the government without compensation. At no time during this period did he consent to the acceptance of the $1,000,000 stipulated in the McCumber treaty. On the contrary, he uniformly and consistently contended that that amount was grossly inadequate. Such was the situation when, in 1901, O'Grady, who was then a member of Congress and whose term was to expire on the 4th of March of that year, learned of the claim of this band of Indians through one Finn, an assistant attorney in the office of the Assistant Attorney General of the United States, in charge of Indian depredation claims. Finn and O'Grady were from the same state and friends. Through Finn's instrumentality Bottineau and O'Grady were brought together, and, upon Finn's representation that O'Grady was a man of influence and an attorney of ability, Bottineau assigned to O'Grady his contract with the tribe, and a contract between them was concurrently executed on the 25th of February, 1901. Since O'Grady's term of office had not then expired, it was subsequently deemed

advisable to re-execute these papers. This was accordingly done on March 6th, 1901.

In the contract between Bottineau and O'Grady, it is agreed (*inter alia*) that the sum of $23,000, which the contract recites had been expended by Bottineau in the prosecution of the claim, should first be deducted from any fees which might be recovered, and that, after such deduction, one fourth of the balance should be paid to Bottineau and the remaining three fourths to O'Grady. O'Grady agreed to "give in good faith his personal services and assistance in the preparation and prosecution of the said claim to its final adjudication and settlement," and to pay all necessary expenses of such prosecution, including the expenses of Bottineau during the time his services, in the judgment of O'Grady, might be necessary. O'-Grady was to have "full charge and management of the preparation and prosecution of said claim," and Bottineau was to render such services as O'Grady might require and deem necessary. The contract further provided as follows: "In. event of judgment being obtained in the sum not exceeding one million (1,000,000) dollars, then and in that case the sum of twelve thousand five hundred (12,500) dollars shall be deducted and paid to said Bottineau, in lieu of the twenty-three thousand (23,000) dollars aforesaid, before the division of any fees or commissions as herein stated."

O'Grady, in his answer (to the bill of complaint) under oath, stated that Bottineau "represented to him that he had a valid contract with the Turtle Mountain Indians that had been properly executed in accordance with the statutes of the United States." In his testimony, however, O'Grady stated that Bottineau, at the time of assigning said contract, represented "that all it lacked in order to have full force and effect was the approval of the Commissioner of Indian Affairs and the Secretary of the Interior." From the testimony of Bottineau and his daughter, we find the fact to be that O'Grady was fully advised before executing the contract with Bottineau as to the exact state of Bottineau's contract with the Indians. O'Grady's subsequent conduct was quite in harmony with this

finding, for we immediately find him endeavoring to encompass the approval by the Department officials of the Bottineau contract. Bottineau and his daughter testified that one of the reasons held out to them for assigning the contract to O'Grady was that O'Grady, owing to his influence, would be able to procure the ratification by the Department of that contract. This testimony is reasonable and probably in accordance with the facts.

Failing in their efforts to have the Bottineau contract approved, the consent of the Department was sought and obtained to negotiate a new contract with the Indians. A council of the Indians was arranged on their reservation in North Dakota, to take place in October, 1901. There is some dispute as to whether Bottineau suggested attending this council with O'-Grady, or whether O'Grady first requested him to do so. At all events, he did attend with the knowledge and consent of O'Grady, and in supposed compliance with the terms of their contract. Bottineau contends that he labored earnestly and conscientiously with his friends and acquaintances on the reservation, to induce them to enter into a new contract with O'Grady. O'Grady and Finn, who attended the council, testified that Bottineau was intoxicated when he reached the reservation, and for several days thereafter; that he was without influence in the tribe, and a much greater hindrance than help. They also testified that the farmer in charge was so incensed because Bottineau had brought whisky upon the reservation that he would have ejected Bottineau therefrom but for them. It is a very significant fact, however, that the testimony of said farmer in charge and other witnesses who were also supposed to know of Bottineau's condition while on the reservation contains no reference to this subject. This is all the more significant because the testimony of these witnesses was taken by appellants, without a representative of Bottineau being present.

O'Grady further testified that he was so disgusted with Bottineau, and so incensed because of his misrepresentations, that he then notified Bottineau that their relations were at an end. Again, the circumstances tend to sustain Bottineau and dis-

prove O'Grady's contentions. While no contract was then entered into between the Indians and O'Grady, Bottineau remained upon the reservation for some time and labored with his friends to induce them to influence the tribe to enter into such a contract. This conduct is hardly consistent with the theory that O'Grady had then notified Bottineau of the severance of their relations. Upon his return to Washington, Bottineau frequently saw Finn, who we are satisfied was acting for and on behalf of O'Grady, and whose representations to Bottineau led Bottineau to believe that O'Grady still considered himself bound by the terms of their contract. As the result of said trip of O'Grady and Bottineau to the reservation, and their subsequent efforts, another council was authorized and held early in 1902, which resulted in representatives of the tribe being sent to Washington as delegates, to contract with counsel for the prosecution of the claim. This delegation was in charge of the Indian agent, who was acquainted with and a friend of the appellant Maddux. Maddux resided not far from the reservation. On starting for Washington the agent saw Maddux, and suggested to him that he come to Washington and endeavor to secure employment as one of the attorneys to prosecute the claim of the Indians. Maddux embraced this suggestion with alacrity, and proceeded at once to Washington, where he first met O'Grady, who had come on to meet the delegation. While here the delegates visited Bottineau and he visited them, at all times urging them, as he had previously urged upon his friends and kinsmen of the tribe, that they enter into a contract with O'Grady. Supposing that the inclusion of Maddux in no way affected his rights, Bottineau interposed no objection to his being associated with O'Grady. On March 7th, 1902, a contract was entered into between these delegates representing the Turtle Mountain Band of Indians and O'Grady and Maddux, by the terms of which O'Grady and Maddux were "to represent and defend, urge and prosecute, the interests, rights, and demands of the said band before the committees of Congress, executive departments of the government, or any of the courts thereof, or before any board of arbitration or ref-

eree duly appointed, for compensation for unceded lands in
North Dakota which were appropriated by the United States
without the sanction of said band; and to recover, collect, and
secure *the value of said lands* from the United States, and to
cause and provide for the payment and disposition of the same
to the said band and the individual members thereof." The
claim of the band was described in the agreement as a claim for
10,000,000 acres of land, the title to which, the agreement assert-
ed, was still in the band, and that said land had been appropriat-
ed by the United States without the consent of the Indians,
and that no compensation whatever had been paid for said land.
The contract stipulated as compensation to said O'Grady and
Maddux that they should be paid "5 per centum of the amount
or value of any money or other property which shall be received
and secured in any manner, either by judgment of the courts
or by action of Congress, to said first parties [Turtle Moun-
tain Indians], and whether said recovery shall be in money
or other form of property, or evidence of indebtedness to said
parties, up to and including the sum of one million dollars ($1,-
000,000), and a sum equal to 10 per centum of all moneys or
other property which shall be received, collected, and secured
in excess of one million dollars ($1,000,000), in any manner,
by reason of his or their services." The only material differ-
ence between this contract and the said Bottineau contract was
that in the Bottineau contract he was to receive 7 per centum
of the gross amount recovered. The O'Grady and Maddux
contract was not approved until February 12th, 1903, when,
so far as the record discloses, without the knowledge and con-
sent of the Indians, it was approved upon condition that the
maximum amount of compensation to be paid O'Grady and
Maddux should not exceed $50,000, and that they should, with-
in thirty days, assent to the condition. This assent was giv-
en.

Maddux, in his testimony, disclaimed all knowledge, at the
time he became a party to said contract, of Bottineau and his
previous relations with O'Grady. His testimony, however, is
so full of inconsistencies, so evasive, so contradicted by his own

correspondence and the other testimony in the case, that it is entitled to little weight. O'Grady admitted under cross-examination that, before Maddux and himself became associated in the case, they discussed its features "and talked it over very considerably;" that they discussed what had been done, and how far the case had progressed. The witness then testified: "I told him all that had been done with reference to this claim of the Indians but whether it was before Congress or the Indian office or the Interior Department; anything I knew I told him, and we discussed it at length." The witness was then asked: "You told him all you knew about it?" and he answered: "That is what I have said." On January 29th, 1904, Bottineau wrote Maddux at length and in a spirit of criticism, because, as Bottineau conceived, neither O'Grady nor Maddux was pushing the claim. The letter, after a recapitulation of the situation as understood by Bottineau, stated: "Therefore I hope you will come as soon as possible, and between you, Mr. Marshall [a then representative in Congress from North Dakota], and myself, we can arrange this matter satisfactorily I believe without sacrificing the valuable claim of my kinsfolk for this comparative bagatelle of a million dollars at this late day, when I could have gotten it with a million more if I only would have acceded it twelve years ago, when this 10-cent treaty was sent to Congress for ratification."

In reply to this letter Maddux wrote in part as follows: "On my return from Washington I found your letter on my desk, and was very much surprised at the contents, for we had every reason to believe that you were friendly to us, and especially so with your understanding with O'Grady. * * * I hope you will reconsider the matters and things stated in your communication, and follow a different course, and I think you will have no cause to regret such determination. * * * Expected to see you while I was in Washington, but was there only a short time. * * * Matters seemed to be in good condition. * * * Expect to see you when I come down again, which will be at no distant date. With kindest personal regards, I am," etc.

This letter was typewritten and on the letter head of Maddux. When shown him he disclaimed any recollection of it, but would not deny that he wrote it. In view of the fact that the statements therein contained are inconsistent with his testimony to the effect that he first learned of Bottineau just prior to the appropriation by Congress for said claim, it is not at all surprising that his memory had somewhat lapsed concerning it. We entertain no doubt that it was written by him. This letter, the testimony of O'Grady, and the fact that the files of the Interior Department concerning this case were replete with evidences of Bottineau's prior connection with the case, conclusively disprove the contention of Maddux that he was not fully cognizant, when he associated himself with O'Grady, of the exact conditions upon which O'Grady first became identified with the case. We are convinced that he had full knowledge of these conditions, and was as much bound thereby as O'Grady.

Upon the modification by the Interior Department of the contract between the Indians and appellants, no further effort appears to have been made by appellants to recover for the Indians more than the $1,000,000 stipulated for in the said McCumber treaty, and which the Indians for twelve years had been unwilling to accept.

On April 21st, 1904, an appropriation of $1,000,000 was made by Congress in favor of said Indians, and, by the terms of the act, there was made payable to O'Grady and Maddux the sum of $42,000, and to William D. Anderson, whose identity is a mystery, and who appears never to have done anything in the case, the sum of $8,000, which sums were to be "accepted by them respectively in full payment for all services rendered the Indians by them, *or by those claiming under them.*" No money was to be paid under said act until the Indians had executed and delivered to the United States a general release of the claims and demands against the United States. This release was finally obtained. Thereupon O'Grady and Maddux repudiated Bottineau, and refused to recognize any liability to him.

The testimony of William A. Jones, who was Commissioner of Indian Affairs from May, 1897, to January, 1905, throws much light upon this case.   Mr. Jones stated that Bottineau represented the Turtle Mountain Indians before his office while he was Commissioner, and that he believed Bottineau's efforts contributed materially in inducing the government to compensate the Indians for their lands; that from the records of the Department he was able to state that Bottineau had devoted a great deal of time to the prosecution of the claim, and "that he had spent considerable money in having his case printed for examination by the Interior Department;" that the conference committee of the two Houses conferred with him relative to the payment of attorney's fees to O'Grady and Maddux, and that he advised several members of the committee that Bottineau was interested in the claim; that prior to O'Grady's contract with the Indians he had informed the witness that he proposed to give Bottineau an interest in the contract, and called upon witness frequently in regard to having the claim recognized by Congress.   Witness further stated that the Department for a long time had been favorable to an appropriation ·for the amount recommended by the McCumber commission, but that the Indians themselves thought that they ought to receive a greater compensation, which caused a delay in the ratification of the agreement.   Witness further stated that, while the O'-Grady and Maddux contract was before him for approval, Bottineau and his daughter urged him to approve it, advising him that Bottineau's interests were protected under it, and *that he received similar assurances from O'Grady,* as the result of which he agreed to approve, and did approve, the contract.

This testimony, considered in the light of the other evidence in the case, we think establishes beyond question that both O'Grady and Bottineau understood, and acted upon the understanding, that the terms of the contract between them were still in force, and would furnish a measure for the division of the fees appropriated by Congress.   The fact that the contract assigned O'Grady by Bottineau had not been approved by the Department is immaterial.   O'Grady knew it had not been ap-

proved and, in his contract with Bottineau, he was contemplating that it might be necessary to negotiate a new contract with the Indians. That Bottineau performed the services required of him by the terms of the contract with O'Grady, there can be no question.

The situation, therefore, amounts to this: Bottineau had labored for many years in behalf of these Indians, and his legitimate expenses had amounted to thousands of dollars; O'Grady appeared upon the scene; Bottineau was evidently discouraged and ready, for the first time, to admit the necessity for assistance. O'Grady stepped into Bottineau's shoes, and, for the privilege and Bottineau's continued co-operation, agreed that, in the event the amount recovered for the Indians should not exceed $1,000,000, $12,500 should first be deducted from the fees allowed, to reimburse Bottineau for his expenses, which were fixed in the contract as amounting to $23,000, and that one fourth of the balance should be paid Bottineau as his fee. To evade the plain and unambiguous terms of this contract, O'Grady now says that Bottineau did not have the influence with the tribe that he represented himself to have, and that he in no way contributed to the employment of O'Grady by the tribe. The contract says nothing about the extent of Bottineau's influence, and we have found that he exerted whatever influence he had in O'Grady's favor. While there is some testimony to the effect that the Indians were desirous of securing other or additional counsel, the testimony on the whole, we think, shows not only that Bottineau did all he could to induce the Indians to enter into the contract with O'Grady and Maddux and to secure the ratification of that contract, but that this was done upon the representation of O'Grady, through Finn, that O'Grady was continuing to recognize the contract between them.

That the council of October, 1901, did not result in a new contract is by no means decisive of Bottineau's rights. The Bottineau and O'Grady contract contains no such restriction. Whether one or a dozen councils were necessary is not material, so long as it appears that Bottineau fulfilled the conditions of his agreement with O'Grady. The fact remains that a contract

finally was made and ratified, and that this was brought about by the withdrawal and co-operation of Bottineau. It would be unconscionable now to allow appellants, upon the facts presented, to appropriate to themselves the fruits of this man's labors. As Commissioner Jones testified, the Department of the Interior had always been willing to urge the payment of $1,000,000 in liquidation of the claim of these Indians. Bottineau, with rare persistency and fidelity to the interests of his clients, as he saw them, wanted more. He supposed, and the Indians supposed, when appellants were employed, that they would seek to obtain more; but nothing of the kind was done. So far as the record discloses, appellants did no more than Bottineau could have done at almost, any time within ten years. Yet they seek to deprive him of any compensation whatsoever. We think the record fully justifies the conclusion that appellants are bound by the terms of the Bottineau and O'Grady contract, and that Bottineau is therefore entitled to have $12,500 first deducted from said $42,000, and also one fourth of the balance, making $19,875 in all. As the judgment of the trial court was evidently based upon this view of the case, it is apparent that an error of $1,000 was made in the computation of the amount of the decree. The decree will therefore be amended so as to read $19,875, instead of $18,875.

As amended the decree is affirmed, with costs.    *Affirmed.*

On December 15, 1909, a motion by the appellants to stay the mandate was overruled.